CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

September 18, 2025

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **PAULUS IRVIN PERKINS,** | ) | |
| **Plaintiff,** | ) | **Case No. 7:23-cv-00074** |
| | ) | |
| **v.** | ) | |
| | ) | **By: Michael F. Urbanski** |
| **D. NEWCOMER, et al.,** | ) | **Senior United States District Judge** |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Paulus Irvin Perkins, a Virginia inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983 against nine individuals employed by the Virginia Department of Corrections (VDOC): D. Newcomer, Lynn Graham, J. Chittum, Carl Manis, L. Canterbury, B. Lokey, R. Northrup, C. L. Parr, and Robert Bivens. Perkins claims that the defendants violated his rights under federal and state law by impeding his efforts to obtain a media device offered through JPay LLC (JPay). The case is presently before the court on the defendants' renewed motion for summary judgment, ECF No. 62, and Perkins's motion and memorandum in opposition, ECF Nos. 69 and 69-1. For the reasons set forth below, Perkins's motion is **DENIED**, and the defendants' motion is **GRANTED**.

### I.    Factual Background

The following facts from the summary judgment record are either undisputed or presented in the light most favorable to Perkins. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Perkins is an African American inmate who has been in the custody of the VDOC for at least ten years. At all times relevant to the complaint, Perkins was incarcerated at Augusta Correctional Center (ACC).

During the time period at issue, D. Newcomer was the acting warden at ACC, Lynn Graham was the operations manager, J. Chittum and L. Canterbury held the position of grievance coordinator, B. Lokey was an intelligence officer with the rank of lieutenant, and R. Northrup was a correctional security officer with the rank of major. The other three defendants worked at the VDOC's Western Regional Office. Carl Manis was the regional administrator, and C. L. Parr and Robert Bivens[1] held the position of regional ombudsman. Answer, ECF No. 24, ¶¶ 2–10.

JPay, a subsidiary of Securus Technologies (Securus), is a third-party contractor that provides products and services to the VDOC's inmate population, including JPay tablets. JPay tablets are media devices that inmates can possess to communicate with friends and family, listen to music, and play games. Woodson Aff., ECF. No. 33-1, ¶ 4.

Prior to May 1, 2021, inmates had to purchase tablets using funds from their JPay accounts. If an inmate did not own a tablet but had a JPay account, they could log on to a JPay kiosk to communicate by email with family and friends. JPay kiosks are located in each pod for inmates to use. Id.

Perkins purchased his first JPay tablet in 2014. Perkins Decl., ECF No. 42, ¶ 14. In August 2020, prior to being transferred to ACC, Perkins turned in a "broken JP5 tablet" to

---

[1] Bivens is identified in the complaint as Robert Bate. By previous order, the docket was updated to reflect his correct last name. ECF No. 25.

the property department at Nottoway Correctional Center. Perkins Decl., ECF No. 42-1, ¶ 27. Although he continued to utilize other services offered by JPay, he did not possess a JPay tablet after transferring to ACC. Perkins Decl., ECF No. 42, ¶¶ 15, 17.

In February 2022, the VDOC announced that new JPay tablets would be provided to inmates to use at no charge while in VDOC custody. Tuttle Aff., ECF No. 36-1, ¶ 4. On February 10, 2022, VDOC Chief of Corrections Operations A. David Robinson issued a memorandum to all wardens and superintendents containing the following information about the new "JP6S" (also referred to in the record as "JP6") tablets offered by JPay:

> Please be advised that JPay will be offering inmates an opportunity to receive a new JP6S tablet to replace the JP5 mini tablets. The new JP6S tablets will be issued as a loaner tablet at no charge to the inmate. Once the facility has transitioned to the new JP6S tablets, the JP5 mini tablets will be discontinued for use in the VADOC.
>
> Inmates assigned to Buckingham Correctional Center, who currently possess a JP5 mini tablet, will be the first to transition to the loaner JP6S tablet. Once the inmates at this facility transition to the new tablets, any inmate that does not currently possess a JP5 mini tablet will be permitted to submit an order to receive a new loaner JP6S tablet at no charge.
>
> After Buckingham Correctional Center has fully transitioned, JPay will transition other facilities in each region until all inmates have transitioned to the new loaner JP6S tablet.
>
> Once the transition is completed at each facility, any JP5 mini tablet found in the possession of an inmate is contraband and the inmate may be charged with Possession of Contraband under Operating Procedure 861.1, Offender Discipline, Institutions. In addition, the inmate will not be eligible to possess a new media device for 24 months.
>
> The inmate population will be given an opportunity to send their JP5 mini tablet to their home address without content. The inmate will have access to his owned content using the loaner

> JP6S tablet. If the inmate does not wish to transition to the JP6S
> tablet, the inmate is required to ship the JP5 mini tablet home
> along with a flash drive of their content.
>
> Additional information will be provided to the inmate population
> as each facility transitions to the new tablets. If you have any
> questions please contact Melissa Welch . . . .

Tuttle Aff. Encl. A, ECF No. 36-1.

ACC served as a pilot site for the tablet distribution project. Graham Resp. Interrog. 7, ECF No. 63-6. Procedures for the transition to JP6 devices were developed by VDOC headquarters and JPay. ACC "provided JPay with logistical assistance and notified JPay of issues identified during the process." Northrup Resp. Interrog. 7, ECF No. 63-5.

According to Perkins, ACC correctional officers entered his housing unit "[o]n two separate occasions, in mid-April 2022 and then again around the beginning of May 2022," and presented what he describes as a "contract" to receive a new tablet. Perkins Decl., ECF No. 42-1, ¶ 26. Perkins alleges that he "signed two contracts" and, by doing so, expressly stated that he "wished to accept the stipulated considerations required by JPay LLC and the VDOC to be distributed a JP6S tablet." Id.

The tablet transition at ACC was scheduled for May 10–20, 2022, with "tablet collection" beginning on the first day. Perkins 740012, ECF No. 42-3 at 21.[2] On April 29, 2022, Melissa Welch, the JPay contract administrator for the VDOC, sent defendant

---

[2] Perkins submitted 131 pages of exhibits as attachments to his memorandum in opposition to the defendants' initial motion for summary judgment. Some of the exhibits include documents produced in response to his discovery requests. When referencing those documents, the court will cite to the Bates numbering found in the lower-right corner of the documents, as well as the page numbers assigned by the court's CM/ECF system.

Newcomer and other wardens an email containing the following information regarding the tablet transition:

> JPay is in the process of shipping the tablets to your facility, but not all inmates will receive a tablet during this initial transition period . . . . [T]hose inmates that have active accounts that are in good standing and have a tablet in their possession that has not been modified or altered will receive a new JP6S tablet. Once these inmates transition to the new tablet and VADOC staff has confirmed that the tablets are properly credentialed (allowing a 2 to 3 week period to confirm), any inmate that does not currently have a tablet or would like to receive one may order a JP6 tablet at no cost to the inmate through the JPay kiosk. When the inmates can place an order for a new tablet, the order button will activate on the kiosk. The inmate can then log in to their account to place the order.

Perkins 740013–0014, ECF No. 42-3 at 23, 37.

Consistent with the instructions provided by Welch, ACC inmates who possessed JP5 tablets to exchange were designated as the first inmates to receive the new JP6 tablets. Before the new tablets were distributed, ACC staff members did rounds of the facility and attempted to collect the existing JP5 tablets. During the tablet collection process, two lists were made: a red list and a green list. Inmates who turned in their JP5 tablet were put on the green list and were to receive a new JP6 tablet first. Inmates who did not turn in a JP5 tablet were put on the red list. Inmates on the red list were required use the JPay kiosks at the facility to request a JP6 tablet once the inmates on the green list received their new devices. Tuttle Aff., ECF No. 36-1, ¶ 5

It is undisputed that Perkins did not produce a JP5 tablet when ACC staff did rounds to collect them. Consequently, "he was put on the red list and had to wait to request a JP6 player from the kiosk when it was available to do so." Id. ¶ 6.

5

On May 17, 2022, a JPay representative distributed JP6 tablets to other inmates in Perkins's housing unit, including his white cellmate, John Steigerwald. When asked why Perkins did not receive a tablet, the representative informed Perkins that even though he had "a sufficient supply of JP6S tablets to distribute every [ACC] inmate a tablet[,] . . . Acting Warden David Newcomer had presented him with a red list and a green list which determined which ACC inmates would and would not receive a JP6 tablet." Perkins Decl., ECF No. 42-1, ¶ 11.

That same day, Newcomer issued a memorandum to the inmate population informing them that ACC would "be allowing ALL inmates to receive a JP6 loaner tablet." Tuttle Aff. ¶ 5 & Encl. B, ECF No. 36-1. The memorandum provided additional information on the tablet transition process and noted that JP5 tablets would be considered contraband once the facility transitioned inmates to the JP6 tablets. Id.

As of May 17, 2022, there were 1,076 inmates housed at ACC. Graham Resp. to Interrog. 8, ECF No. 63-6. Defendant Graham was eventually tasked with overseeing the tablet transition project at ACC "because of its large scope and unexpected complications." Graham Resp. Interrog. 7, ECF No. 63-6. Graham worked with JPay and Securus to ensure that ACC inmates received working tablets. Id.

When inmates on the red list began requesting tablets, JPay would send multiple tablets to the facility with a master list of which inmates were to receive them. According to the defendants' evidence, it sometimes took inmates three months or longer to receive a tablet after requesting one. During the same timeframe, inmates at other VDOC facilities were also placing requests for tablets. Tuttle Aff. ¶ 5.

On June 1, 2022, Graham emailed ACC staff members, including defendants Chittum and Canterbury, and advised them that she had received a list of all of the ACC inmates who had received a JP6 tablet from JPay. Graham noted that any inmate who complained about not receiving a JP6 tablet would need to provide his name, inmate number, and housing assignment as soon as possible and that she would "compile a list of those inmates for JPay." Perkins 740022, ECF No. 42-3 at 17.

That same day, Perkins submitted a regular grievance complaining about the fact that he had not yet received a tablet. Perkins asserted that he had signed a "contract" to receive a tablet and that he was "legally entitled to possess [one] per the terms of the contract." Conner Aff. Encl. C, ECF No. 63-7 at 85. Pursuant the VDOC's grievance procedure, inmates are generally required to submit an informal written complaint prior to filing a regular grievance, and the "Instructions for Filing" on the grievance form indicate that an inmate "must attach" the written complaint or other documentation used to satisfy the informal complaint process. Id. The grievance form also includes a section titled "Results of the Informal Process," in which an inmate must indicate whether the written complaint or other documentation used to satisfy the informal process is attached to the form. Id. Although Perkins asserted in the regular grievance that he had "filed [an] informal complaint against Warden Newcomer on [May 18,] 2022," and that the informal complaint had gone "unanswered," he did not submit a copy of the informal complaint or check the box indicating that other documentation used to satisfy the informal complaint process was attached to the grievance form. Id.

On June 3, 2022, defendant Chittum rejected the grievance during the intake process. Id. at 86. Chittum checked the box indicating that Perkins must submit documentation

7

showing that he had utilized the informal complaint process for the grieved issue. Id. Perkins appealed the intake decision to the regional ombudsman, and on June 9, 2022, defendant Parr upheld the decision. Parr noted that CORIS contained no record of any written complaint on the same issue being received prior to June 3, 2022. Id.

On June 5, 2022, Perkins submitted a written complaint alleging that Chittum had violated his Fourteenth Amendment rights by rejecting the regular grievance that he submitted on June 1, 2022. Defendant Canterbury responded to the written complaint on June 6, 2022. Canterbury informed Perkins that he could appeal any intake decision that he disagreed with to the regional ombudsman. Conner Aff. Encl. D, ECF No. 63-7 at 87; see also Perkins Ex., ECF No. 42-4 at 22.

On June 7, 2022, Perkins submitted a "trouble ticket" to JPay using the kiosk in his housing unit. Perkins Decl., ECF No. 42-1, ¶ 14. He noted that he was not on the "green list" of inmates who received tablets on May 17, 2022, and requested that JPay send him a tablet. Id. According to Perkins, a JPay representative subsequently responded via email that a tablet had already been shipped for him but that the company would proceed with sending "a replacement second JP6S tablet within 30–45 days." Id.

On June 8, 2022, Perkins filed a regular grievance against Chittum for refusing to process the grievance that he submitted on June 1, 2022. Perkins Ex., ECF No. 42-4 at 24. The grievance was accepted at intake and assigned to defendant Newcomer for a Level I response. Id. at 26. On June 21, 2022, Newcomer determined that the grievance was unfounded and that Perkins could have appealed Chittum's intake decision to the regional ombudsman if he disagreed with it. Perkins appealed the Level I decision to the regional

administrator, and defendant Manis upheld the decision at Level II of the grievance process. Id. at 27.

On June 15, 2022, Perkins submitted a written complaint alleging that he had still not received a JP6 tablet even though he "signed a binding contract" to receive one. He asserted that Warden Newcomer was "violating the terms of that contract" and expressed the belief that he was "being discriminated against as a Black person." After receiving the written complaint on June 16, 2022, Chittum provided the following response:

> All inmates will receive a JP6 tablet. Complaint forwarded to operations.
>
> If you have yet to receive a JP6 tablet, please send a request to operations with your name, number, and housing. Thank you.

Conner Aff. Encl. E, ECF No. 63-7 at 90.

On June 19, 2022, Perkins submitted a regular grievance raising the same issues. Id. at 88. Chittum rejected the grievance on June 21, 2022. Id. at 89. Chittum noted that "ACC has no control over JPay" and that Perkins should "send an offender request to operations." Id. Perkins appealed the intake decision to the regional ombudsman, and defendant Bivens upheld the decision on June 25, 2022. Id.

After being directed to contact the operations department, Perkins submitted an offender request addressed to "Lynn Graham, Operations Mgr.," asking why he had "still not received a JP6 loaner tablet," despite having "signed a legally binding contract to receive one." Perkins. Ex., ECF No. 42-4 at 29. On June 30, 2022, S. Conner responded that a request had been submitted to JPay on June 17, 2022. Id.; see also Graham Resp. Interrog. 17, ECF No. 63-6.

Prior to receiving the response to his offender request, Perkins submitted another written complaint alleging that he had signed "a binding contract to receive a JP6 tablet" and that he had still not received one. Conner Aff. Encl. F, ECF No. 63-7 at 93. He noted that he had been instructed to write to operations and that "operations never responded." Id. He alleged that Graham was "preventing [him] from receiving a JP6 loaner tablet." Id. On July 1, 2022, Chittum responded that Perkins's complaint regarding the distribution of JP6 tablets had been addressed and that "[a]ll inmates" would receive a JP6 tablet. Id. at 35.

On July 10, 2022, Perkins submitted a regular grievance containing similar allegations and requesting to receive a JPay loaner tablet like white prisoners. Id. at 91. On July 11, 2022, Chittum rejected the grievance at intake on the basis that the VDOC had "no control over JPay." Id. at 92. Perkins appealed the intake decision to the regional ombudsman, and defendant Parr upheld the decision on July 19, 2022. Id.

As of July 13, 2022, more than 70 ACC inmates who requested JP6 devices had not received one yet. Perkins 7400032–7400033, ECF No. 42-3 at 35–36. The list of inmates indicates that a JP6 device was requested for Perkins on June 17, 2022. Id.

On August 12, 2022, an ACC correctional official issued a memorandum to the inmate population regarding JP6 tablets. Perkins Ex., ECF No. 42-4 at 41. The memorandum instructed inmates not to use the kiosk to re-order a new JP6 tablet if they already had a JP6 tablet in their possession. Id. The memorandum indicated that JPay had been "overwhelmed with requests for tablets by individuals who already possess a tablet" and that the requests were "hindering" the upgrades that JPay was attempting to make. Id.

As of August 20, 2022, Perkins had still not received a JP6 tablet. Perkins Decl. ¶ 16, ECF No. 42-1. When he attempted to send another trouble ticket to JPay through his JPay account, he received the following message:

> WIFI 1231 L – You cannot create a new communication.
> Inmate has reached maximum number of communications.

Id. Perkins alleges that his ability to contact JPay remained blocked for the next several months. Id.

On September 30, 2022, Perkins submitted a written complaint alleging that "all electronic access to [the] JPay Communications Center" had been "blocked . . . on the orders of . . . Warden D. Newcomer and carried out by ACC Investigator B. Lokey." Conner Aff. Encl. G, ECF No. 63-7 at 96. The written complaint was received by the grievance department on October 3, 2022, and assigned to defendant Northrup. Id. Twenty-five days later, on October 28, 2022, Northrup provided the following response:

> After review I have found that your account was not shut off by ACC staff. If this is still an issue please contact the JPay Service Unit by putting in a trouble ticket.

Id.

Perkins subsequently submitted a regular grievance alleging that he could not submit a trouble ticket to JPay because his "email access to the company was still blocked" and he received an error message each time he attempted to submit a trouble ticket. Id. at 94. On November 14, 2022, Chittum rejected the grievance as untimely. Id. at 95. Perkins appealed the intake decision to the regional ombudsman, and Parr upheld the decision. Id.

On October 4, 2022, the grievance department received a written complaint from Perkins alleging that defendant Manis had discriminated against him and violated his

constitutional rights by "upholding" what he described as "Warden D. Newcomer's . . . decision to bar [him] from possessing a JP6 loaner tablet." Conner Aff. Encl. H, ECF No. 63-7 at 99. The written complaint was forwarded to the operations department. That same day, Graham provided the following response: "You need to order a JP6 tablet on the kiosk. JPay will then send you a tablet." Id.

Perkins then filed a regular grievance containing similar allegations. Id. at 97. Chittum rejected the regular grievance on October 13, 2022, on the basis that it raised an issue "[b]eyond the control of the Department of Corrections." Id. at 98. Chittum reported that ACC had "not received" a JP6 tablet for Perkins and that the problem was "a JPay issue." Id. Perkins appealed the intake decision to the regional ombudsman, and Parr upheld the decision. Id. Parr noted that Perkins could contact JPay directly about the issue. Id.

On October 10, 2022, Perkins sent JPay a certified letter providing notice of a potential lawsuit against the company. Perkins Decl., ECF No. 42-1, ¶ 21. JPay did not respond to the notice. Id.

On October 12, 2022, Perkins was sent to segregation after Officer A. Ferguson charged him with two disciplinary offenses: "threatening bodily harm" and "interference with count procedures." Id. ¶ 22. Ferguson submitted two disciplinary offense reports on October 12, 2022, which were approved by Unit Manager K. Simmons. With respect to the charge of "[t]hreatening bodily harm to any person verbally, by gesture, or actions," Ferguson reported that while conducting cell checks on October 12, 2022, Perkins stated in a threatening manner that Ferguson needed to "realize who [Ferguson was] messing with." Perkins Ex., ECF No. 42-4 at 48–49. Ferguson further reported that Perkins "walked down the pod steps staring

directly at [Ferguson] in a very aggressive manner" after Ferguson requested supervisors to report to the housing unit "due to being threatened by offender Perkins." Id. at 49.

On October 16, 2022, Perkins submitted a written complaint against defendant Newcomer, the assistant warden, and the unit manager. Perkins asserted that Newcomer was "using his authority to retaliate against [Perkins] for exhausting the administrative process on his refusal to allow [Perkins] to possess a JP6 tablet like white prisoners." Id. at 65. Perkins reported that it was "the second time [he had] been sent to segregation for 'looking' at a white woman who was yelling and threatening [him]." Id. On October 17, 2022, Canterbury responded that the written complaint was "repetitive," that it raised "more than one issue," and that issues regarding the JP6 tablet had been addressed in prior complaints. Id.

On October 30, 2022, Perkins filed a regular grievance alleging that Officer Ferguson had falsely charged him with two disciplinary offenses "as a pretext to cover up a retaliatory attack by Warden Newcomer." Id. at 71. Perkins also complained about being sent to segregation. Id. On November 1, 2022, Chittum rejected the grievance at intake and requested that Perkins "state [his] one issue clearly." Id. at 72. Perkins appealed the intake decision to the regional ombudsman, and Parr upheld the decision. Id. Parr noted that the grievance covered "a wide range of numerous complaints/issues." Id.

On November 27, 2022, Perkins submitted a written complaint alleging that defendant Manis had conspired with other VDOC staff members to violate his federal rights "by upholding every decision made" to "prohibit [Perkins] from being distributed a free JP6 loaner tablet like white prisoners received from JPay LLC representatives." Id. at 73. In a response dated November 28, 2022, Chittum noted that "[w]ritten complaints must be addressed to

13

institutional staff or an institutional department" and that "ACC has no control over the responses from the regional offices." Id.

On November 30, 2022, Perkins signed a regular grievance alleging that the "respondent for Regional Administrator Carl Manis" had "contributed to a conspiracy to deprive [Perkins] of his federal rights" by upholding the decisions made by other correctional officials regarding his request for a JP6 tablet. Id. at 74. On December 1, 2022, Chittum rejected the grievance as untimely, noting that "issues regarding JP6 tablets have expired." Id. at 75. Perkins appealed the intake decision to the regional ombudsman, and defendant Parr upheld the decision. Id.

In January 2023, Perkins filed this action against Newcomer, Graham, Chittum, Manis, Canterbury, Lokey, Northrup, Parr, and Bivens in the United States District Court for the Eastern District of Virginia. The case was transferred to this district in February 2023. After Perkins paid the entire filing fee, he was advised that he would be responsible for service of process. On March 9, 2023, the Clerk issued proposed summonses for the named defendants.

On March 17, 2023, a Securus account manager forwarded an email to Melissa Welch regarding a potential lawsuit by Perkins and inquired as to whether Perkins was "on any restriction from receiving a tablet." Lokey Decl. Encl. A, ECF No. 63-1 at 4. The account manager noted that a review of Perkins's JPay account revealed that "he had an order to receive a tablet, but it was never connected." Id. The account manager also reported that Perkins was claiming to have been banned by the facility from receiving a tablet. Id.

On the evening of March 29, 2023, Welch forwarded the account manager's email to defendant Newcomer and asked whether there was any reason why Perkins could not use a

JPay tablet. Id. At 2:38 a.m. on March 30, 2023, Newcomer forwarded the email to defendant Lokey, defendant Northrup, and other ACC staff members and asked if they were aware of Perkins "being on any kind of restrictions from [having] a JP6." Id. Newcomer emphasized that he "need[ed] to know as soon as possible." Id. At 7:27 a.m., Lokey responded that the investigations department did not have Perkins's tablet and that he would look into the matter as soon as he arrived at the prison. Id. at 3.

Shortly after 10:00 a.m. on March 30, 2023, Lokey spoke to Perkins while wearing a body camera. The defendants submitted the recorded video footage of the conversation as Enclosure B to Lokey's declaration. During the conversation, Perkins advised Lokey that he had not received a JP6 tablet and that he had not had access to a tablet since he turned in a broken JP5 tablet in 2020. Lokey Decl. Encl. B, ECF No. 71, at 0:00:46–0:00:58. When Lokey asked Perkins whether he had raised the issue with the property department or a unit manager, Perkins informed Lokey that he had filed a federal lawsuit against Lokey and other officials. When Lokey noted that it was his understanding that every inmate was supposed to receive one of the free JP6 tablets, Perkins explained that "the focus of the lawsuit" was the fact that he had not gotten one, despite being informed by JPay that a tablet had been sent to him at ACC. Id. at 0:07:10. When Lokey attempted to clarify that Perkins "just need[ed a] JP6 tablet," Perkins responded that he would not accept a tablet while his lawsuit remained pending. Id. at 0:07:18–0:08:00. Perkins suggested that Lokey could still obtain a JP6 tablet for him but that Lokey should "keep it in property" until Perkins received the injunctive relief that he had requested as part of the complaint filed in federal court. Id. at 0:08:46–0:09:06.

15

On May 16, 2023, JPay shipped multiple JP6 tablets to ACC. Tuttle Aff. ¶ 8. The master packing list included tablets specifically designated for ten inmates, including Perkins. Tuttle Aff. Encl. D, ECF No. 36-1.

On June 6, 2023, ACC provided Perkins with a master pass to retrieve the JP6 tablet that had arrived for him. Tuttle Aff. ¶ 10. When Perkins reported to the property department, he "refused to take possession" of the new tablet because he "did not want to moot [his] claims" against the defendants. Perkins Decl., ECF No. 42-1, ¶ 30; see also id. ("I believe if I take possession of the JP6S tablet without a court order I forfeit any claims to damages and the money I've spent to file the lawsuit [and] draft the complaint as a paralegal . . . . I believe I deserve relief and to be compensated just like any other legal professional, employed as a legal assistant or paralegal."). The tablet was held for Perkins in the property office at ACC while he was housed at that facility. Tuttle Aff. ¶ 10.

On November 29, 2023, Perkins was transferred to Sussex I State Prison (SISP). Paillant Aff., ECF No. 63-8, ¶ 4. The VDOC subsequently announced that ACC was expected to close on June 30, 2024. Since ACC could no longer hold the JP6 tablet intended for Perkins, prison officials sent the tablet to SISP. Id.

On August 14, 2024, Perkins was offered the JP6 tablet by SISP staff, and he refused to accept it. The record indicates that the property office at SISP still has the tablet intended for Perkins and that "it is ready for his use when he is ready to accept it." Id. ¶¶ 5–6.

Sworn responses to interrogatories propounded by Perkins indicate that Newcomer, Graham, and Lokey did not give or receive any order to block Perkins from receiving a JP6 tablet or from communicating with JPay by email. See Newcomer Resp. Interrogs. 9, 10, 12,

13, ECF No. 63-4; Graham Resp. Interrogs. 9, 10, 12, 13, ECF No. 63-6; Lokey Resp. Interrogs. 9, 10, 13, 14, ECF No. 63-3; see also Northrup Resp. Interrogs. 9, 10, 12, 13, ECF No. 63-5 (indicating that Northrup does "not recall" any such directives and that he "would not have been responsible in [his] position" for placing a block on Perkins's JPay account). The responses also indicate that Manis, as a regional director for the VDOC, was not responsible for the JP6 tablet distribution process or for managing inmates' JPay accounts. Manis Resp. Interrogs. 10, 11, ECF No. 63-2.

Between June 2022 and September 18, 2023, Perkins sent and received approximately 55 emails through his JPay account using the kiosks available to ACC inmates. Woodson Aff., ECF No. 33-1, ¶ 7. Perkins concedes that he was able to send emails to family members and other individuals during that time period. Perkins Decl., ECF No. 42-1, ¶ 28. However, he maintains that his "email access to JPay . . . was blocked between August 20, 2022 and around the date the court filed this lawsuit." Id. Perkins "can confirm with JPay . . . records that he could once again contact JPay by email" as of "March 17, 2023." Mem. Opp'n Renewed Mot. Summ. J., ECF No. 69-1, at 34.

## II.      Procedural History

In January 2023, Perkins filed a 78-page complaint against the defendants. A section titled "Claims for Relief" includes 11 numbered claims. Those claims are summarized as follows:

> **Claim One**: Defendants Newcomer, Graham, Chittum, and Manis violated Perkins's right to procedural due process under the Fourteenth Amendment by refusing to allow JPay representatives to issue him a free JP6 tablet.

**Claim Two**: Defendants Newcomer, Graham, Chittum, Bivens, Canterbury, Parr, and Manis violated Perkins's right to contract under the Fourteenth Amendment by preventing him from exercising his contractual right to purchase, enjoy, and use JPay products and services.

**Claim Three**: Defendants Newcomer, Graham, Chittum, Bivens, Canterbury, Parr, and Manis engaged in race discrimination in the context of making and enforcing contracts, in violation of 42 U.S.C. § 1981.

**Claim Four**: Defendants Newcomer, Graham, and Manis discriminated against Perkins based on his race, in violation of the Equal Protection Clause of the Fourteenth Amendment.

**Claim Five**: Defendants Newcomer, Graham, and Manis discriminated against Perkins as a "class of one," in violation of the Equal Protection Clause of the Fourteenth Amendment.

**Claim Six**: Defendants Newcomer, Chittum, Graham, Canterbury, Parr, Bivens, and Manis conspired to deprive Perkins of his right to equal protection, in violation of 42 U.S.C. § 1985(3).

**Claim Seven**: Defendants Manis, Parr, Bivens, Newcomer, Graham, Canterbury, and Chittum neglected to prevent a conspiracy to deprive Perkins of his right to equal protection, in violation of 42 U.S.C. § 1986.

**Claim Eight**: Defendants Newcomer, Lokey, Chittum, Parr, and Northrup violated Perkins's right to free speech under the First Amendment by blocking his email access to JPay and/or failing to respond to his complaints regarding the issue.

**Claim Nine**: Defendants Newcomer, Graham, Chittum, Parr, Bivens, Canterbury, Manis, Lokey, and Northrup violated the Commerce Clause of the United States Constitution.

**Claim Ten**: Defendants Newcomer, Graham, Lokey, Northrup, and Manis violated Perkins's right to contract under the Constitution of Virginia.

> **Claim Eleven**: Defendants Newcomer, Chittum, Canterbury, Bivens, Parr, Manis, and Graham violated Perkins's right to equal protection under the Constitution of Virginia.

Compl., ECF No. 1, at 33–73. Perkins seeks declaratory relief, injunctive relief, and monetary damages. Id. at 74–77. The defendants are sued in their individual and official capacities. Id. at 7–9.

In May 2023, the defendants agreed to waive formal service of process after Perkins delivered summonses and a copy of the complaint to the Office of the Attorney General of Virginia via certified mail. See Notice of Appearance, ECF No. 14. The defendants filed an answer to the complaint on June 26, 2023. ECF No. 24.

The defendants initially moved for summary judgment on September 18, 2023. ECF No. 32. The defendants argued that some of Perkins's claims were subject to dismissal for failure to state a claim upon which relief may granted. As to other claims, the defendants relied on affidavits to support the motion for summary judgment. See Defs.' Br. Supp. Mot. Summ. J., ECF No. 33.

After receiving two extensions of time to respond to the motion for summary judgment, Perkins filed a 101-page response in opposition to the motion and motions for relief under Federal Rule of Civil Procedure 56(d). ECF Nos. 41 and 42. In support of the motions, Perkins asserted that discovery remained ongoing and that he had not yet obtained documents relevant to certain claims. Perkins subsequently filed additional discovery requests, including requests for admission, requests for production of documents, and interrogatories, ECF No. 50, and the defendants filed a motion for extension of time to respond to the discovery requests, ECF No. 51.

On September 25, 2024, the court granted in part and denied without prejudice in part the defendants' motion for summary judgment, granted in part and denied in part Perkins's motions for relief under Rule 56(d), and granted the defendants' motion for extension of time. Relying solely on the allegations in the complaint, the court dismissed Claims One, Two, Six, Seven, Nine, and Ten for failure to state a claim upon which relief may be granted. With respect to the remaining claims for which the defendants relied on affidavits in seeking summary judgment, the court concluded that outstanding discovery rendered summary judgment premature. Accordingly, the court extended the time for the defendants to respond to pending discovery requests, gave Perkins 60 days to complete discovery relevant to the remaining claims, and directed the defendants to file a renewed motion for summary judgment within 75 days. See Mem. Op., ECF No. 52; Order, ECF No. 53.

On December 6, 2024, the defendants moved for an extension of time in which to file their renewed motion for summary judgment. The defendants advised that they had "responded to all of the Plaintiff's outstanding discovery requests" during the intervening period and that they needed an additional 30 days to complete their renewed motion. ECF No. 60 at 2–3. The motion for extension of time was granted on December 9, 2024, and the defendants timely filed their renewed motion for summary judgment on January 8, 2025. ECF No. 62. In support of the renewed motion, the defendants submitted affidavits and sworn responses to interrogatories and requests for admission propounded by Perkins, among other evidence. See Defs.' Br. Supp. Renewed Mot. Summ. J., ECF No. 63, at 2 (listing the evidence submitted in support of the motion).

On February 3, 2025, Perkins filed a motion for extension of time to respond to the defendants' renewed motion for summary judgment. ECF No. 65. That motion was granted on February 5, 2025, and Perkins was directed to file any response to the motion for summary judgment by March 4, 2025. ECF No. 66. After receiving a second extension of time, ECF No. 68, Perkins filed a motion in opposition to the defendants' renewed motion for summary judgment, ECF No. 69, along with a 38-page memorandum in opposition to the defendants' motion, ECF No. 69-1, which adopts his response to the defendants' initial motion for summary judgment. Approximately one month later, Perkins filed a declaration expressing the belief that correctional officials are now conspiring to violate his constitutional rights at SISP. ECF No. 70.

### III.   Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, the court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson, 477 U.S. at 248–49).

When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. To survive summary judgment, there must be sufficient evidence from which a reasonable jury could return a verdict in the nonmoving party's favor. Id. at 252. "Conclusory or speculative

21

allegations do not suffice to oppose a properly supported motion for summary judgment, nor does a mere scintilla of evidence." <u>Matherly v. Andrews</u>, 859 F.3d 264, 280 (4th Cir. 2017) (internal quotation marks and citation omitted).

## IV.   Discussion

### A.   Perkins's Motion in Opposition

The court will first address the motion that Perkins filed in opposition to the defendants' renewed motion for summary judgment. ECF No. 69. In the motion, and at various points in the accompanying memorandum, Perkins suggests that summary judgment is inappropriate because the defendants have not fully complied with his discovery requests. <u>Id.</u> at 1; <u>see also</u> Mem. Opp'n Renewed Mot. Summ. J., ECF No. 69-1, at 13 (asserting that the defendants avoided providing "a complete response" to interrogatories; <u>id.</u> at 17 ("[F]or the most part, Plaintiff has not advanced in his discovery efforts in any significant manner than when he submitted his first request for production of documents on August 27, 2023.").

"[T]he Supreme Court has instructed that summary judgment motions should only be granted 'after adequate time for discovery.'" <u>Jenkins v. Woodard</u>, 109 F.4th 242, 250 (4th Cir. 2024) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)). "Consistent with that instruction, [the Fourth Circuit] has cautioned that district courts should not consider summary judgment motions where the nonmoving party has not had an opportunity to discover information essential to its opposition." <u>Id.</u> Granting summary judgment prematurely "is particularly disfavored in the context of pro se litigation, and when facts bearing on the subjective knowledge of defendants are exclusively in the control of the opposing party." <u>Shaw v. Foreman</u>, 59 F.4th 121, 128–29 (4th Cir. 2023) (internal quotation marks omitted). For

instance, in <u>Pledger v. Lynch</u>, 5 F.4th 511 (4th Cir. 2021), the Fourth Circuit "held that it was an abuse of discretion to grant summary judgment to a defendant when the plaintiff could not 'present facts essential to justify his opposition' because he had not been given a <u>reasonable opportunity</u> to gather those essential facts." <u>Firewalker-Fields v. Lee</u>, 58 F.4th 104, 123 (4th Cir. 2023) (emphasis added) (quoting <u>Pledger</u>, 5 F.4th at 526). Similarly, in <u>Shaw v. Foreman</u>, the Fourth Circuit held that "[t]he district court abused its discretion by granting summary judgment pre-discovery" in a case filed by an unrepresented inmate. 59 F.4th at 129. In that case, even though the inmate "expressed a desire to investigate the [defendants'] evidence," <u>id.</u>, the district court granted summary judgment "without affording him <u>any</u> opportunity to conduct discovery," <u>id.</u> at 126 (emphasis added).

Unlike <u>Shaw</u> and <u>Pledger</u>, the court is not currently presented with a pre-discovery motion for summary judgment or a motion filed without the plaintiff receiving a reasonable opportunity to complete discovery. As indicated above, the court previously denied the defendants' initial motion for summary judgment without prejudice with respect to the five remaining claims, extended the time for the defendants to respond to pending discovery requests, and set a deadline for Perkins to complete discovery relevant to the remaining claims, as permitted by Rule 56(d). <u>See</u> <u>Farabee v. Gardella</u>, 131 F.4th 185, 193 (4th Cir. 2025 ("Under Federal Rule of Civil Procedure 56(d) . . . , where a nonmovant shows by affidavit or declaration that 'for specified reasons, it cannot present facts essential to justify its opposition' to a motion for summary judgment, a district court may deny or defer consideration of the motion, allow time for the nonmovant to take discovery before assessing the motion, or issue any other order it deems appropriate.") (quoting Fed. R. Civ. P. 56(d)). At the time of the

court's September 25, 2024, decision, the defendants had already responded to interrogatories and requests for production of documents. The record reflects that the defendants subsequently responded to outstanding discovery requests before filing their renewed motion for summary judgment, including requests for admissions and additional interrogatories.

Although Perkins requested and received additional time to respond to the defendants' renewed motion for summary judgment, he did not seek to extend the discovery deadline set forth in the court's previous order or move to compel the defendants to provide further responses to any particular discovery requests. In his memorandum in opposition to the defendants' renewed motion for summary judgment, Perkins indicates that he is generally dissatisfied with the defendants' responses to his discovery requests. However, his overall dissatisfaction with the discovery the defendants possessed and produced in response to his requests does not warrant further relief under Rule 56(d). See Escobar-Salmeron v. Moyer, --- F.4th ----, 2025 WL 2348707, at *7 (4th Cir. Aug. 14, 2025) (emphasizing that "merely alleging that the Correctional Officers had not been responsive to [the plaintiff's] discovery requests," without having moved to compel or permit discovery, was insufficient to obtain relief under Rule 56(d); Kamara v. Prince George's Cnty. Dep't of Corr., No. ELH-15-3952, 2017 WL 735549, at *10 (D. Md. Feb. 24, 2017) (declining to stay summary judgment where a pro se plaintiff merely expressed "dissatisfaction with the responses of the Correctional Defendants to her discovery requests").

As was true in Escobar-Salmeron and Kamara, Perkins has not identified any specific, yet-to-be-discovered facts that would create a "genuine issue[] of material fact sufficient to defeat summary judgment" on any of the remaining claims. Escobar-Salmeron, 2025 WL

2348707, at *7; see also Kamara, 2017 WL 735549, at *10 (emphasizing that the plaintiff had

not identified "any legitimate need for additional discovery as to any of the named defendants"

or provided "any indication that additional materials would create a genuine issue of material

fact"). Consequently, Perkins has not shown that further relief is warranted under Rule 56(d).

See Escobar-Salmeron, 2025 WL 2348707, at *6 ("Rule 56(d) 'motions may be denied . . . if

the additional evidence sought for discovery would not have by itself created a genuine issue

of material fact sufficient to defeat summary judgment.'") (quoting Ingles ex rel. Est. of Ingle

v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006)); see also Firewalker-Fields, 58 F.4th at 124

(concluding that a pro se inmate was not entitled to relief under Pledger and Rule 56(d) since

he had not shown that discovery would have "aided in developing essential facts").

     For these reasons, Perkins's motion in opposition is denied, and the court will proceed

to address the defendants' renewed motion for summary judgment.

## B.  The Defendants' Renewed Motion for Summary Judgment

     The defendants have moved for summary judgment on the five claims that remain

pending following the court's decision on the defendants' initial motion for summary

judgment (Claims Three, Four, Five, Eight, and Eleven). Before turning to the merits of the

remaining claims asserted against the defendants in their individual capacities, the court will

first address Perkins's claims against the defendants in their official capacities.

### 1.  Official Capacity Claims

     Actions against state officials in their official capacity are "treated as suits against the

State" and therefore implicate the Eleventh Amendment. Hafer v. Melo, 502 U.S. 21, 25

(1991). "The Eleventh Amendment and the broader principles of federalism it reflects

generally prevent private parties from suing a State [in federal court] without its consent."
King v. Youngkin, 122 F.4th 539, 543 (4th Cir. 2024). The immunity afforded by the Eleventh
Amendment "extends to arms of the State, including state agencies and state officers acting in
their official capacity." Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996) (internal citation
omitted). As relevant here, "[t]he Eleventh Amendment bars suit against state officials in their
official capacity for damages under 42 U.S.C. § 1983," Lawson v. Gault, 828 F.3d 239, 278
(4th Cir. 2016), and 42 U.S.C. § 1981, Russell v. Colmenero, No. 23-10160, 2023 WL 6518147,
at *1 (5th Cir. Oct. 5, 2023) (citing Sessions v. Rusk State Hosp., 648 F.2d 1066, 1069 (5th Cir.
1981)). It also bars any state constitutional claim asserted against the defendants in their official
capacity, regardless of the relief sought. Equity in Ath., Inc. v. Dep't of Educ., 639 F.3d 91,
107 (4th Cir. 2011); see also Experimental Holdings, Inc. v. Farris, 503 F.3d 514, 520–21 (6th
Cir. 2007) ("The Supreme Court has squarely held that pendent state law claims against state
officials in their official capacity are barred by the Eleventh Amendment.") (citing Pennhurst
State Sch. v. Halderman, 465 U.S. 89, 117–21 (1984)).

Although the Eleventh Amendment "does not prevent federal courts from granting
prospective injunctive relief to prevent a continuing violation of federal law," Green v.
Mansour, 474 U.S. 64, 68 (1985) (citing Ex parte Young, 209 U.S. 123, 155–56, 159 (1908)),
the record reflects that Perkins's claims for injunctive relief have been rendered moot. "A
claim may be mooted when the claimant receives the relief he or she sought to obtain through
the claim." Williams v. Ozmint, 716 F.3d 801, 809 (4th Cir. 2013). This circumstance plainly
exists in the present case, since Perkins has already received the injunctive relief that he
requested in his complaint—access to a JP6 tablet and the ability to contact JPay by email. See

26

Compl. at 75 (requesting "an injunction ordering [the] Director of the Virginia Department of Corrections" to (1) "distribute a JP6 tablet" and (2) "remove the email block" that "prevents [Perkins] from contacting [JPay]"). It is undisputed that a JP6 tablet has been available for Perkins to retrieve since June 6, 2023, and Perkins has acknowledged that he is no longer "blocked" from contacting JPay. Mem. Opp'n Renewed Mot. Summ. J., ECF No. 69-1, at 34. Consequently, the court concludes that Perkins's claims for injunctive relief are moot. See Williams, 716 F.3d at 809 (reaching the same decision where an inmate already "received the restoration of his visitation privileges that he requested in his complaint").

For these reasons, the claims against the defendants in their official capacity, including the claims for injunctive relief, will be dismissed without prejudice. See Pense v. Md. Dep't of Pub. Safety & Corr. Servs., 926 F.3d 97, 99, 103 (4th Cir. 2019) (remanding for dismissal without prejudice based on Eleventh Amendment immunity); Lamle v. Eads, 134 F.4th 562, 566 (10th Cir. 2025) (explaining that a dismissal based on mootness "should have been without prejudice" since "mootness is jurisdictional").

### 2. Race Discrimination Claim under Section 1981 (Claim Three)

In Claim Three, Perkins asserts that defendants Newcomer, Graham, Chittum, Bivens, Canterbury, Parr, and Manis impeded his right to contract with JPay on the basis of his race, in violation of 42 U.S.C. § 1981. Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b). "To prove a

§ 1981 claim, . . . a plaintiff must ultimately establish <u>both</u> that the defendant intended to discriminate [against the plaintiff] on the basis of race, and that the discrimination interfered with a contractual interest." <u>Denny v. Elizabeth Arden Salons, Inc.</u>, 456 F.3d 427, 434 (4th Cir. 2006) (emphasis added); <u>see also</u> <u>Guerrero v. Ollie's Bargain Outlet, Inc.</u>, 115 F.4th 349, 354 (4th Cir. 2024).

Perkins's claim under § 1981 fails at the first step: he has not cited any evidence from which a reasonable jury could find that any of the named defendants engaged in intentional race discrimination. The Supreme Court has made clear that "§ 1981, like the Equal Protection Clause, can be violated only by <u>purposeful</u> discrimination." <u>Gen. Bldg. Contractors Ass'n v. Pennsylvania</u>, 458 U.S. 375, 391 (1982) (emphasis added). "The statute is 'is limited to conduct motivated by a discriminatory purpose' and does not extend to a policy [or practice] with only a discriminatory impact." <u>Resendiz v. Exxon Mobile Corp.</u>, 72 F.4th 623, 628 (4th Cir. 2023) (quoting <u>Gen. Bldg. Contractors</u>, 458 U.S. at 386); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676–77 (2009) ("[P]urposeful discrimination requires . . . a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' adverse effects upon an identifiable group.") (quoting <u>Pers. Adm'r of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979)). "To prevail, a plaintiff must initially plead and ultimately prove that, but for race, [the plaintiff] would not have suffered the loss of a legally protected right." <u>Comcast Corp. v. Nat'l Ass'n of African American-Owned Media</u>, 589 U.S. 327, 341 (2020).

In response to the defendants' renewed motion for summary judgment, Perkins argues that the fact that he, as an "incarcerated African American," was not distributed a JP6 tablet when other inmates received them is sufficient to establish a violation of § 1981 and that "[it]

is <u>irrelevant</u> that other Black prisoners were issued a JP6 tablet." Mem. Opp'n Renewed Mot. Summ. J., ECF No. 69-1, at 22 (emphasis added). This argument is plainly without merit. The mere fact that Perkins is African American is insufficient to establish that any of the defendants intentionally discriminated against him based on his race. This is true even if all of the defendants are white. <u>See, e.g.</u>, <u>Arrington v. Ala. Power Co.</u>, 769 F. App'x 741, 747 (11th Cir. 2019) ("Although she consistently identified the race of her coworkers and supervisors in her amended complaint, the mere fact that these individuals were white did not plausibly show that Plaintiff suffered any discrimination or harassment on the basis of her race."); <u>Howard v. City of New York</u>, 602 F. App'x 545, 548 (2d Cir. 2015) ("[T]he fact that Howard is white and the East River Park employees are black or Hispanic is insufficient, by itself, to raise an inference of intentional racial discrimination."); <u>Reed v. Heimgartner</u>, 579 F. App'x 624, 626 (10th Cir. 2014) ("We agree with the district court that Plaintiff did not present a plausible claim that he was treated discriminatorily because of his race. His bare conclusory allegations that he is African American of Moorish descent and was mistreated because of his race are insufficient."); <u>Brent v. Cramer</u>, No. JKB-22-1349, 2024 WL 3878145, at *4 (D. Md. Aug. 20, 2024) ("A plaintiff can show discriminatory intent by circumstantial evidence, as well as by direct evidence . . . . The mere fact that a plaintiff is Black and the defendants are white is insufficient.").

Although Perkins is understandably frustrated with the fact that he did not gain access to a JP6 tablet until after he filed this lawsuit, he "has done little more than cite to his alleged mistreatment and ask the court to conclude that 'it must have been related to [his] race.'" <u>Howard</u>, 602 F. App'x at 545 (quoting <u>Lizardo v. Denny's, Inc.</u>, 270 F.3d 94, 104 (2d Cir.

2001)). This is "not sufficient" to survive summary judgment on his claim of race discrimination in violation of § 1981. Id. (internal quotation marks omitted); see also Brown v. Whole Foods Mkt. Grp., Inc., No. 22-1860, 2023 WL 6442917, at *2 (4th Cir. Oct. 3, 2023) ("[I]n order to prevail upon a § 1981 claim of race-based discrimination, a plaintiff must prove more than differential treatment. Rather, the plaintiff must 'ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right.'") (quoting Comcast Corp., 589 U.S. at 341); Abrego v. Wilkie, 907 F.3d 1004, 1014 (7th Cir. 2018) (emphasizing that plaintiff's personal belief that he was treated differently because of his race was "insufficient to give rise to a genuine factual dispute over whether he was the victim of race . . . discrimination") (internal quotation marks omitted). For these reasons, the defendants' motion for summary judgment will be granted with respect to the § 1981 claim asserted in Claim Three.

### 3.    Constitutional Claims under Section 1983 (Claims Four, Five, and Eight)

Claims Four, Five, and Eight are brought pursuant to 42 U.S.C. § 1983. Section 1983 "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013). "Liability under § 1983 must be analyzed individually for each defendant." Jones v. Solomon, 90 F.4th 198, 207 (4th Cir. 2024).

### a.    Claim Four

In Claim Four, Perkins asserts that Newcomer, Graham, and Manis discriminated against him based on his race, in violation of the Equal Protection Clause of the Fourteenth Amendment. This claim is based on the fact that Perkins did not receive a JP6 tablet on the

same day that his white cellmate did, even though both inmates had allegedly "signed a contract to receive a JP6 tablet" and a JPay representative indicated that there were "enough JP6 tablets to distribute to all prisoners who wanted to receive a tablet." Compl. at 42–43.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Clause's "central aim is to bar government decisionmakers from 'treating differently persons who are in all relevant respects alike.'" Alive Church of the Nazarene, Inc. v. Prince William Cnty., 59 F.4th 92, 112 (4th Cir. 2023) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). "This does not mean, however, that all prisoners must receive identical treatment and resources." Hartmann v. Cal. Dep't of Corr. & Rehab., 707 F.3d 1114, 1123 (9th Cir. 2013) (citing Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972)). "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). If the plaintiff makes this initial showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id.

Perkins's claim of race discrimination in violation of the Equal Protection Clause fails at the threshold. To the extent the claim is based on the disparity in treatment between himself and his white cellmate, he has not offered evidence sufficient to establish that he and his cellmate were similarly situated. "Generally, in determining whether persons are similarly situated for equal protection purposes, a court must examine all relevant factors." United States v. Olvis, 97 F.3d 739, 744 (4th Cir. 1996). Individuals "are similarly situated when their

31

circumstances present no distinguishable legitimate . . . factors that might justify making different . . . decisions with respect to them." United States v. Venable, 666 F.3d 893, 900–01 (4th Cir. 2012).

Here, before JPay representatives began distributing the new JP6 tablets in May 2022, VDOC officials David Robinson and Melissa Welch specifically advised Newcomer and other wardens that inmates "who currently possess a JP5 mini tablet" would "be the first to transition" to the new JP6 tablet and that other inmates would then be allowed to order a new tablet from JPay. Tuttle Aff. Encl. A, ECF No. 36-1 at 5; Perkins Ex., ECF No. 42-3 at 30. It is undisputed that Perkins did not possess a JP5 tablet when the tablet transition process began at ACC, and he has not alleged or presented evidence that his cellmate was similarly situated in that respect. Thus, Perkins has failed to show that he and his cellmate were "in all relevant respects alike" at the time his cellmate received a new tablet. Nordlinger, 505 U.S. at 10 (emphasis added).

Additionally, Perkins has not offered evidence sufficient to show that any unequal treatment "was the result of intentional or purposeful discrimination" based on his race. Morrison, 239 F.3d at 65. "[T]o  establish an equal protection violation, a plaintiff must establish more than differential treatment alone—a discriminatory intent or purpose is required." Maye v. Klee, 915 F.3d 1076, 1085 (6th Cir. 2019); see also Orgain v. City of Salisbury, 305 F. App'x 90, 102 (4th Cir. 2008) (noting that "disparate treatment alone is insufficient to support [a] constitutional remedy") (citing Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach, 420 F.3d 322, 328–29 (4th Cir. 2005)). As was true with Perkins's claim under § 1981, the mere fact that Perkins is African American is insufficient to show that race

32

discrimination played a role in him not receiving a JP6 player as quickly as other inmates. See Eskridge v. Phila. Hous. Auth., 722 F. App'x 296, 300 (3d Cir. 2018) (holding that the fact that the plaintiff was African American was "woefully insufficient" to prove the existence of purposeful discrimination in violation of the Equal Protection Clause); Rondigo, LLC v. Twp. of Richmond, 641 F.3d 673, 682 (6th Cir. 2011) (emphasizing that "mere allegations that Dolores Michaels is a woman and Rondigo is a woman-owned business do not make out a claim for gender-based discrimination targeting them as members of a suspect class"). Likewise, while it is clear from the record that Perkins personally believes that he has been the victim of discrimination, his "subjective belief that he was discriminated against [on the basis of race], standing alone, is not adequate evidence to survive a motion for summary judgment." Stout v. Vincent, 717 F. App'x 468, 472 (5th Cir. 2018) (internal quotation marks omitted).

For these reasons, the defendants are entitled to summary judgment on the equal protection claim asserted in Claim Four.

  **b.  Claim Five**

In Claim Five, Perkins asserts that Newcomer, Graham, and Manis discriminated against him as a "class of one," in violation of the Equal Protection Clause of the Fourteenth Amendment. This claim is based on the fact that Perkins had still not received a JP6 tablet at the time he filed this action in January 2023, despite being informed by JPay on June 26, 2022, that a tablet had already been ordered for him on two occasions and that "delivery of the second JP6 tablet sent . . . for him would take 30–45 days." Compl., ECF No. 1, at 47.

The Supreme Court has recognized that an equal protection claim may be brought by a "class of one" in certain circumstances. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). A plaintiff who brings a class-of-one claim must show that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id.

Here, the record reflects that over 1,000 inmates were housed at ACC on May 17, 2022, and that approximately 75 other inmates who requested a JP6 tablet after that date had not received one as of July 13, 2022. Even assuming that some or all of those other inmates were issued a JP6 tablet prior to Perkins, he has not presented any evidence from which a reasonable jury could infer that the differential treatment was the result of discriminatory animus on the part of the named defendants.

As the Fourth Circuit recently explained in the context of a class-of-one claim, "[d]iscriminatory animus cannot be established simply by showing 'that a benefit was denied to one person while conferred on another.'" SAS Assocs. 1, LLC v. City Council for the City of Chesapeake, 91 F.4th 715, 720 (4th Cir. 2024) (quoting Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 918 (4th Cir. 1995)). "Rather, there must be some evidence that the disparate treatment was intentionally selected to produce 'adverse effects upon an identifiable group' or individual." Id. (quoting Wayte v. United States, 470 U.S. 598, 610 (1979)). In other words, Perkins must demonstrate that an official undertook a course of action "because of, not merely in spite of, [the action's] adverse effects upon [him]." Iqbal, 556 U.S. at 677 (first alteration in original) (internal quotation marks omitted); see also N. Pacifica LLC v. City of Pacifica, 526 F.3d 478, 486 (9th Cir. 2008) ("A class of one plaintiff must show that the

34

discriminatory treatment 'was intentionally directed just at him, as opposed . . . to being an accident or random act.'") (quoting Jackson v. Burke, 256 F.3d 93, 96 (2d Cir. 2001)). "If disparate treatment alone were sufficient to warrant a constitutional remedy, then every blunder by a local [or state] authority, in which the authority erroneously or mistakenly treats an individual differently than it treats another who is similarly situated, would rise to the level of a federal constitutional claim." Sylvia Dev. Corp., 48 F.3d at 825.

Additionally, when a plaintiff seeks to hold a defendant liable in their individual capacity under § 1983, "liability for an Equal Protection Clause violation . . . requires personal involvement by [that] defendant, who must act with discriminatory purpose." Reynolds v. Barrett, 685 F.3d 193, 204 (2d Cir. 2012) (citing Iqbal, 556 U.S. at 676). This means that "a plaintiff must identify evidence that each individual defendant acted (or failed to act) with a culpable state of mind." King v. Riley, 76 F.4th 259, 269 (4th Cir. 2023). "Without this defendant-specific evidence, a plaintiff cannot get past summary judgment."[3] Id.

Here, there is no evidence that Newcomer, Graham, or Manis acted (or failed to act) with the intent to discriminate against Perkins. Turning first to Manis, the record reflects that Manis worked in the VDOC's Western Regional Office and that he "did not manage" the "transition to the JP6 tablets [or the] distribution of the tablets to inmates." Manis Resp. Interrog. 10, ECF No. 63-2. Manis's only involvement in the events giving rise to this action

---

[3] To the extent Perkins argues that the doctrine of respondeat superior "most certainly applies," ECF No. 69-1 at 31, that doctrine "has no application" under § 1983. Wilcox v. Brown, 877 F.3d 161, 170 (4th Cir. 2017) (internal quotation marks omitted); see also Iqbal, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior . . . . Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead [and ultimately prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

was to review and respond to at least one grievance appeal challenging the rejection of a grievance in which Perkins complained about not receiving a JP6 tablet. However, prison officials who simply process or review inmate grievances "lack personal involvement in the conduct forming the basis of the grievance." Owens v. Evans, 878 F.3d 559, 563 (7th Cir. 2017). The mere fact that the grievance submissions reviewed by Manis accused prison officials of violating Perkins's constitutional rights is not enough to hold Perkins personally liable for discrimination. See Iqbal, 556 U.S. at 677 (rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution"); Stewart v. Beach, 701 F.3d 1322, 1328 (10th Cir. 2012) ("Whatever knowledge Roberts may have had when he denied the appeal, his only involvement was to deny the grievance appeal, which is insufficient for § 1983 liability.").

The record reflects that Newcomer and Graham <u>were</u> involved in the tablet transition process at ACC. As the acting warden, Newcomer received and relayed communications regarding the transition to JP6 tablets, and Graham "was eventually delegated to oversee the project." Graham Resp. Interrog. 7, ECF No. 63–6. However, there is no evidence indicating that Newcomer or Graham intentionally or purposefully prevented Perkins from receiving a tablet in a timely manner. When specifically asked by Perkins during discovery, Newcomer and Graham both affirmed under penalty of perjury that they did not "ask, tell, order, or otherwise direct anyone assigned to work at ACC NOT to distribute a JP6S tablet" to Perkins and that they were not "asked, told, ordered, or otherwise directed . . . by anyone, including other VDOC employees, NOT to distribute a JP6S tablet" to Perkins. Newcomer Resp. Interrog. 9, 10, ECF No. 63-4; Graham Resp. Interrog. 9, 10, ECF No. 63-6. Responses to

36

Perkins's discovery requests also indicate that Newcomer was not aware that Perkins had still

not received a tablet at the time he filed this lawsuit until Melissa Welch emailed him on March

29, 2023, and that Newcomer immediately asked members of his staff to investigate the

matter.

To the extent Perkins relies on his various written complaints and grievances

expressing dissatisfaction with the fact that he had not yet received a JP6 tablet, the record

reflects that the majority of the complaints and grievances were responded to or returned to

Perkins by the grievance coordinators, without any evidence of Newcomer or Graham being

made aware of them. When a written complaint was actually forwarded to the operations

department in October 2022, Graham responded that Perkins would "need to order a JP6

tablet on the kiosk" and that JPay would then send him a tablet. Conner Aff. Encl. H, ECF

No. 63-7 at 99. While hindsight may indicate that Perkins would have been better served if

Graham had taken other actions, such as calling JPay herself to determine why Perkins had

not yet received a tablet, her response to Perkins's grievance "can be characterized—at

most—as a negligent or reckless failure to take protective action," which "does not suffice to

establish a cognizable class of one claim." Phillips v. Northwest Reg'l Communs., 391 F.

App'x 160, 168 (3d Cir. 2010); see also Roe v. Keady, 329 F.3d 1188, 1191–92 (10th Cir. 2003)

("It is hornbook constitutional law that mere negligence or mistake resulting in uneven

application of the law is not an equal protection violation."); Sylvia Dev. Corp., 48 F.3d at

824 ("[D]isparate treatment, even if the product of erroneous or illegal state action, is not

enough by itself to state a constitutional claim."); Rickett v. Jones, 901 F.2d 1058, 1061 (11th

Cir. 1990) ("The Supreme Court has repeatedly rejected the contention that inequality due to error violates equal protection.").

In short, Perkins's "speculative interpretation" of the manner in which his requests for a JPay tablet were handled, without more, is insufficient to permit an inference of intentional discrimination. C & H Co. v. Richardson, 78 F. App'x 894, 90 (4th Cir. 2003). Because Perkins has not presented evidence from which a non-speculative inference of such intent can be drawn, summary judgment is appropriate. Id. Accordingly, the defendants' motion for summary judgment will be granted with respect to the class-of-one claim asserted in Claim Five.

### c.    Claim Eight

In Claim Eight, Perkins asserts that Newcomer, Lokey, Chittum, Parr, and Northrup violated his right to free speech under the First Amendment by interfering with his "ability to communicate directly and electronically with JPay LLC by email." Compl. at 65. He alleges that Newcomer and Lokey "block[ed] his email access to JPay" and that Chittum, Parr, and Northrup did not properly respond to the written complaint and regular grievance that he filed regarding the issue. Id. at 66–67. Perkins emphasizes that Northrup did not respond to the written complaint that he submitted on September 30, 2022, for 28 days; that Chittum subsequently rejected his related regular grievance as untimely, despite the delayed response from Northrup; and that Parr upheld Chittum's intake decision on appeal. Id.

In moving for summary judgment on this claim, the defendants correctly note that "inmates have no constitutional entitlement or due process interest in access to a grievance procedure." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 541 (4th Cir. 2017). Consequently,

Perkins has no viable "§ 1983 claim alleging denial of a specific grievance process." Id. The defendants also correctly emphasize that Perkins has put forward no evidence to support his assertion that Newcomer, Lokey, or any other named defendant was responsible for blocking his ability to email JPay. When specifically asked by Perkins during discovery, Newcomer and Lokey both averred under penalty of perjury that they did not "ask, tell, order, or otherwise direct anyone . . . to place or allow [an] email block to be placed" on Perkins's account and that no one else "asked, told, ordered, or otherwise directed" them to do so. Lokey Resp. Interrogs. 13, 14, ECF No. 63-3; Newcomer Resp. Interrogs. 12, 13, ECF No. 63-4. Perkins has offered no evidence to dispute the defendants' sworn statements. Accordingly, to the extent Perkins claims that Newcomer, Lokey, Chittum, Parr, and Northrup violated his right to free speech by blocking his email access to JPay or by failing to properly respond to his internal complaints regarding the issue, the defendants are entitled to summary judgment.

In response to the defendants' renewed motion for summary judgment, Perkins asserts that Newcomer, Lokey, Chittum, Parr, and Northrup violated the First Amendment by "retaliat[ing] against [him] for filing grievances." Mem. Opp'n Renewed M. Summ. J., ECF No. 69-1, at 3. Although he then cites to paragraphs 502–534 of his complaint, notably absent from those paragraphs is any mention of retaliation. Even assuming that the complaint could be liberally construed to assert claims of retaliation against Newcomer, Lokey, Chittum, Parr, and Northrup, the court concludes that the claims are without merit.

To state a retaliation claim under § 1983 against any defendant, a plaintiff must allege facts sufficient to establish that "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3)

39

there was a causal relationship between his protected activity and the defendant's conduct." Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) (internal quotation marks and alterations omitted). Conclusory or vague accusations of retaliation do not suffice. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); see also Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994) (affirming the summary dismissal of a retaliation claim that was based on the conclusory assertion that the denial of protective custody occurred as part of a scheme of retaliation).

Here, while Perkins engaged in protected activity by filing written complaints and grievances against the defendants and other correctional officials, he has not plausibly alleged that Newcomer, Lokey, Chittum, Parr, or Northrup took a materially adverse action against him that was causally connected to his protected conduct. To the extent Perkins takes issue with the grievance-related decisions made by Chittum, Parr, and Northrup, "[t]he denial of grievances is not an 'adverse action' for retaliation purposes." Owens v. Coleman, 629 F. App'x 163, 167 (3d Cir. 2015); see also Mitchell v. Thompson, 564 F. App'x 452, 457 (11th Cir. 2014) ("Mitchell also alleges Cross retaliated against him, when she denied his grievances. This allegation fails to state a claim for relief, because it does not show Mitchell suffered an adverse action that likely would deter a person of ordinary firmness from engaging in such speech."). Nor is a delay in responding to grievances or informal complaints. As other courts have explained, "denial or delay is of little consequence because inmates are only required to exhaust available remedies before seeking judicial review." Gonzalez v. Bendt, 971 F.3d 742, 745 (8th Cir. 2020) (citing 42 U.S.C. § 1997e(a); Ross v. Blake, 578 U.S. 632 (2016)); see also Washington v. Myers, No. 4:22-cv-01858, 2023 WL 6797008, at *5 (M.D. Pa. Oct. 13, 2023) ("[R]ejection or dismissal of a grievance—which happens frequently in prisons and is usually

40

the first step in mandatory administrative exhaustion of a civil rights claim—is not an actionable adverse action for retaliation purposes."). Thus, Perkins has no viable First Amendment retaliation claim against Chittum, Parr, or Northrup based on their handling of his written complaints and related grievances.

With respect to Lokey and Newcomer, Perkins asserts that he was "assigned to disciplinary segregation for nearly two weeks" only "10 days after [he] filed the September 30, 2022 informal complaint against [Lokey and Newcomer] for the email block." Mem. Opp'n Initial M. Summ. J., ECF No. 42-2, at 80. However, that particular complaint was assigned to Northrup for a response, and Perkins does not plausibly allege that Lokey or Newcomer had knowledge of the complaint or the related regular grievance that was subsequently rejected at intake. Nor does he plausibly allege that Lokey or Newcomer was personally involved in transferring him to segregation. Perkins acknowledges that he was assigned to segregation after being charged with threatening another correctional officer. There are simply no facts from which the court could reasonably infer that Lokey or Newcomer had Perkins transferred to segregation as a result of the informal complaint submitted on September 30, 2022.

For these reasons, any claim of retaliation that Perkins may have intended to assert against Newcomer, Lokey, Chittum, Parr, or Northrup must be dismissed.

### 4.    State Constitutional Claim (Claim Eleven)

In Claim Eleven, Perkins asserts that Newcomer, Chittum, Canterbury, Bivens, Parr, Manis, and Graham violated his state constitutional right to equal protection. He alleges that he is a member of a protected class as an African American inmate and that "Newcomer et al. subjected [him] to intentional disparate treatment without a rational basis by denying [him] the

41

privilege of possessing a JP6 tablet that John Steigerwald and many other prisoners were allowed to receive [on] May 17, 2022." Compl., ECF No. 1, at 73.

Article I, Section 11 of the Constitution of Virginia guarantees "the right to be free from any governmental discrimination upon the basis of . . . race." Va. Const. art. I, § 11. The Supreme Court of Virginia has interpreted this particular provision to be "no broader than the equal protection clause of the Fourteenth Amendment to the Constitution of the United States." Archer v. Mayes, 213 Va. 633, 638, 194 S.E.2d 707, 711 (Va. 1973). Accordingly, when considering claims of discrimination in violation of Article I, Section 11, Virginia courts "rely on what is required to state a claim for a violation of the Equal Protection Clause of the Federal Constitution." Ibanez v. Albemarle Cnty. Sch. Bd., 80 Va. App. 169, 195–96, 897 S.E.2d 300, 314 (Va. Ct. App. 2024). To prevail on a claim of race discrimination, a plaintiff must initially establish "that 'he has been treated differently from others with whom he is similarly situated,'" "that the differential treatment was intentional," and that he "received differential treatment on the basis of [his] race." 80 Va. App. at 198–99, 897 S.E.2d at 314 (quoting Morrison, 239 F.3d at 654).

For the same reasons set forth above, the defendants are entitled to summary judgment on the state constitutional claim. To the extent Perkins complains of being treated differently than his white cellmate, he has not shown that they were similarly situated at the time JP6 tablets were initially distributed at ACC. Nor has he shown that the delay in receiving a tablet resulted from intentional or purposeful discrimination on the basis of race. Accordingly, the defendants' motion for summary judgment will be granted with respect to Claim Eleven.

### IV.    Conclusion

For the reasons stated, the court concludes that the defendants' motion for summary judgment is ripe for consideration and that the defendants are entitled to summary judgment on the remaining claims. Accordingly, Perkins' motion in opposition, ECF No. 69, is **DENIED**, and the defendants' renewed motion for summary judgment, ECF No. 62, is **GRANTED**.[4] An appropriate order will be entered.

Entered: September 17, 2025

Mike Urbanski
Senior U.S. District
Judge
2025.09.17 23:45:26
-04'00'

Michael F. Urbanski
Senior United States District Judge

---

[4] As noted above, Perkins submitted a declaration complaining of actions taken against him by unidentified correctional officials after he transferred to SISP. ECF No. 70. If Perkins believes that his constitutional rights have been violated during his period of incarceration at that facility, he may file a new civil action under § 1983 in the appropriate district. See 28 U.S.C. § 1391(b) (governing venue in civil actions).

43